Alex R. Straus (SBN: 321366)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
280 Beverly Hills Drive
Beverly Hills, CA 90212
Telephone:   917-471-1894
Facsimile:   310-496-3176
astraus@milberg.com

[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]

Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE: IBM SALES COMMISSIONS PRACTICES LITIGATION | **CONSOLIDATED CLASS ACTION COMPLAINT**<br>**Jury Trial Demanded** |

Plaintiffs Mark Comin and Mark Briggs, individually, and on behalf of all others similarly situated, bring this Second Amended Class Complaint against Defendant International Business Machines Corporation ("IBM") and allege the following:

## **INTRODUCTION**

1.      California Labor Code Section 2751 requires that an employer provide sales representatives who earn commissions with an enforceable written contract

1

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

setting forth the method by which commissions shall be computed and paid that is signed by the employer.

2.     IBM employs hundreds, if not thousands, of sales representatives and managers throughout California who earn sales commissions. However, IBM does not provide those employees with a written, signed, enforceable contract regarding their commissions.

3.     Instead, IBM provides its sales representatives with a letter that expressly states it is not a contract or promise by IBM to pay any sales commissions. IBM explains its commissions plans with PowerPoint type presentations that promise uncapped sales commissions and encourage sales representatives to exceed their quotas each sales period.

4.     However, IBM often caps sales commissions or otherwise does not pay the full commissions due to sales representatives. As a result, it has been sued over two dozen times around the country (including at least six times in California) for failing to pay sales representatives the commissions they were due. Each time, IBM has taken the position in court that it was not obligated to pay any commissions to the representatives because it did not have a contract that required payment of the commissions.

5.     IBM's sales representatives and even managers are often surprised to learn that IBM does not have a binding contract to pay them sales commissions.

6.     IBM's bait and switch where it makes sales representatives believe that they will be paid uncapped sales commissions in accordance with their commissions formula, and then often does not pay as such is precisely the type of conduct that the California Labor Code seeks to deter through its requirement that employers provide written contracts that set forth the method by which commissions will be computed and paid to their sales representatives.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

7.     Plaintiffs Mark Comin and Mark Briggs are additional victims of IBM's blatant disregard for California's Labor Code.

8.     Plaintiffs filed this action to recover the damages they, as well as hundreds of other sales representatives in California, have incurred from IBM's wrongful withholding of sales commissions and to stop IBM's deceptive and unlawful practices in how they structure and administer commissions for all IBM employees in the State of California who are on commission incentive plans.

## PARTIES

1.     Mr. Comin is a citizen of San Rafael, California, in Marin County.

2.     Mr. Comin worked for IBM for over seventeen years, from approximately January 2001 through February 2018.

3.     Mr. Briggs is a citizen of San Clemente California, in Orange County.

4.     Mr. Briggs has worked for IBM for over 26 years, from approximately January 1995 through the present.

5.     IBM was incorporated, and is existing, under the laws of the State of New York.

6.     IBM's principal place of business is in the State of New York.

7.     IBM was and is an employer under the California Labor Code and common law.

8.     IBM employed Plaintiffs and other employees performing sales work for IBM in California.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act. The amount in controversy exceeds $5,000,000 and there are members of the proposed Class who are citizens of a State different from the State of Citizenship of IBM.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

10.     This Court may exercise personal jurisdiction over IBM because IBM conducts substantial business in this State and within the Northern District of California, receives substantial compensation and profits from the marketing, distribution, and sales of products and services in this District, and has engaged in the unlawful practices described in this Complaint in this District.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## INTRADISTRICT ASSIGNMENT

12.     This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because a substantial part of the events or omissions giving rise to Plaintiffs' claims arose in the counties served by the San Francisco Division. Mr. Comin, who is one of the proposed class representatives, as well as dozens, if not hundreds, of class members reside in the counties served by this Division. Moreover, IBM conducts substantial business in the counties served by this Division.

## COMMON FACTUAL ALLEGATIONS

13.     IBM is a global technology company that provides hardware, software, cloud-based services, and cognitive computing.

14.     IBM employs sales representatives and managers throughout the United States that it tasks with selling its products and services.

15.     During all relevant times, IBM's employees that earn sales commissions have typically been on one of seven types of commissions plans.

16.     Typically, under these plans the employees are provided with an annual compensation number called "on-target earnings" ("OTE") which is what the individual's total compensation will be if the individual achieves 100% of his/her quota for the year. The OTE is split between a base salary and commissions. The two most

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

common splits are 55/45 (where 55% of the compensation comes from the base salary, and 45% comes from sales commissions) and 70/30 (where 70% of the compensation comes from a base salary, and 30% comes from sales commissions).

17.     Three of those commissions plans are categorized as Individual Plans, three are Pool Plans, and one is categorized as a Services Plan.

18.     The three Individual Plans are:  (1) Individual Quota Plan (IQP), (2) Absolute Sales Plan – Straight Rate, and (3) Absolute Sales Plan – Opportunity Based.

19.     Commissions under these plans are uncapped and paid based on achievement results (i.e., the amount of products and services sold) rather than on an assessment of employee contribution.

20.     The three Pool Plans are: (1) Team Quota Plan, (2) Solutions for Growth Plan, and (3) Performance Pool Plan.

21.     Under the pool plans, a set amount of commissions is divided among groups of employees based on achievement by the group as a whole.

22.     The Services Plan is a commissions plan that is available to executives and other roles that are focused on large contract delivery, customer satisfaction, and base growth.

23.     IBM splits each calendar year into two sales periods and typically refers to those as the 1H (first half) and 2H (second half).

24.     At the beginning of each sales period, IBM provides each sales representative with a substantially similar, standardized document called an Incentive Plan Letter ("IPL").

25.     The IPLs are typically about five pages long and contain some limited information that is specific to each individual sales representative, such as the representative's quota for that period, the territory the sales representative is responsible for, and the rate at which the sales representative will earn commissions for that period.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

26. The majority of the five pages is devoted to uniform disclaimers. These disclaimers are the same in each sales representative's IPL for each sales period.

27. Among other things, the disclaimers state that the IPL "is not an express or implied contract or a promise by IBM" to pay commissions to that employee.

28. IBM does not have any other contract with its California based sales employees who earn commissions regarding the calculation and payment of those commissions.

29. In the past several years, IBM has routinely failed to pay employees the commissions reflected by the quotas contained in IPLs and other inputs shown on IBM's online commissions workplace.

30. As a result, several sales representatives and managers have sued IBM for not paying them commissions that they were owed.

31. Each time, IBM's defense has been the same: IBM owes nothing because the employees do not have an enforceable contract for the payment of commissions. IBM claims that the IPL is not an enforceable contract, nor is there any other enforceable contract.

32. Indeed, IBM has argued that the IPL is not an enforceable contract, nor is there any other enforceable contract in each of the following cases:

       a.  *Gilmour v IBM*, Case No. CV 09-04155 SJO (C.D. Cal.);

       b.  *Schwarzkopf v. IBM*, Case No. CV 08-2715 JF (N.D. Cal.);

       c.  *Kemp v. IBM*, Case No. 3:09-cv-03683 (N.D. Cal);

       d.  *Pfeister v. IBM*, Case No. 17-cv-03573 (N.D. Cal.);

       e.  *Swafford v. IBM*, Case No. 5:18-CV-04916 (N.D. Cal.);

       f.  *Beard v. IBM*, Case No. 3:18-CV-06783 (N.D. Cal.);

       g.  *Geras v. IBM*, Case No. 10cv-00001-WDM-CBS (D. Colo.);

       h.  *Bereuter v. IBM*, Case No. 8:10-cv-327 (D. Neb.);

       i.  *Kavitz v IBM*, Case No. 4:08-cv-5591 (S.D.N.Y.);

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

j. *Chiaffitelli v. IBM*, Case No. 003150/11 (Sup. Ct. NY, Nassau County);

k. *Pero v. IBM*, Case No. 12-cv-07484 (D.N.J.);

l. *Wilson v. IBM*, Case No. 1:12-cv-1406 (N.D. Ga.);

m. *Tang v. IBM*, Case No. 2014-11444 (Cir. Ct. Fairfax Cty., Va.);

n. *IBM v. Khoury*, Case No. 2016-0258 (Sup. Ct. N.H.);

o. *Rapier v. IBM*, Case No. 1:17-CV-4740 (N.D. Ga.);

p. *Snyder v. IBM*, Case No. 1:16-CV-03596 (N.D. Ga.);

q. *Morris v. IBM*, Case No. 18-CV-0042 (W.D. Tex.);

r. *Choplin v. IBM*, Case No. 1:16-CV-1412 (M.D.N.C.);

s. *Stephenson v. IBM*, Case No. 1:17-CV-1141 (M.D.N.C.);

t. *Vinson v. IBM*, Case No. 1:17-CV-00798 (M.D.N.C.);

u. *Middleton v. IBM*, Case No. 1:18-CV-03724 (N.D. Ga.);

v. *Fessler v. IBM*, Case No. 1:18-CV-00798 (E.D.Va.);

w. *Kingston, Temidis, & Lee v. IBM*, Case No. 156289/2018 (Sup. Ct. N.Y.);

x. *Lamping v IBM*, 2005 WL 4693547 (W.D. Pa.);

y. *Cashman v IBM*, Case No. 05-10306-RWZ (D. Mass.);

z. *Jensen v IBM*, Case No. 04-CA-1316 (E.D. Va.);

aa. *Rudolph v IBM*, Case No. 09-C-428 (N.D. Ill.);

bb. *Camobreco v. IBM*, Case No. 1:19-CV-10242 (D. Mass.); and

cc. *Martignetti v. IBM*, Case No. 1:18-CV-02431 (D. Md.).

33.   Several of these cases, including at least *Swafford* and *Beard*, involved incentive plans from the last four years.

34.   Despite both *Swafford* and *Beard* involving claims for unpaid commissions by sales representatives on 55/45 pay mixes, IBM's litigation position in

7

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

those cases was that the IPLs at issue "did not create a contractual obligation that required IBM to pay Plaintiff additional commissions."

35.    Moreover, IBM argued on appeal in *Middleton* that "Middleton's IPL, while failing to create any contractual obligations requiring IBM to pay him commissions, was a document that spelled out the parties' respective rights and responsibilities regarding the payment of commissions."

36.    California Labor Code Section 2751 dictates that "[w]henever an employer enters into a contract of employment with an employee for services to be rendered within this state and the contemplated method of payment of the employee involves commissions, the contract shall be in writing and shall set forth the method by which the commissions shall be computed and paid." Cal. Lab. Code § 2751.

37.    This provision clearly requires that an employer provide a sales representative whose pay includes sales commissions with an enforceable contract for the payment of the commissions.

38.    The requirement that all employers provide employees earning commissions with a written commission contract became effective January 1, 2013.

39.    An enforceable contract protects commissioned sales employees from exactly the type of bait and switch behavior IBM is engaging in, where it promises compensation to sales representatives of a base salary plus uncapped sales commissions, but then unilaterally decides not to pay the commissions on certain occasions.

40.    The situation where an employer "holds all of the cards" with respect to how much to pay in sales commissions is precisely what this statute is designed to protect employees from.

41.    Without an enforceable contract the commissions would simply be discretionary bonuses, which IBM's sales commissions undisputedly are not.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

42.   Because IBM has openly admitted that it does not have an enforceable contract for the payment of commissions to its employees, IBM's commissions program cannot satisfy the requirements of California Labor Code Section 2751.

43.   Indeed, in *Swafford*, in her Order Granting in Part, Denying in Part, IBM's Motion for Summary Judgment, the Honorable Lucy H. Koh stated that "the Court agrees with Swafford that the IPL is not a contract and that the IPL therefore cannot satisfy the requirements of California Labor Code Section 2751."

44.   After Judge Koh's ruling in *Swafford*, the plaintiff in *Beard* moved for judgment on the pleadings regarding his claim for violation of California Labor Code Section 2751.  IBM claimed in response that the IPL was a document that satisfied the statute, although it never admitted that the IPL was an "enforceable contract" and it never specified the alleged "obligations" that the IPL imposed on IBM.

45.   Plaintiff and the Classes have suffered an injury in fact, including lost money, as a result of IBM's failure to have enforceable written contracts—which presumably IBM would have complied with, but which could be the basis for an easy breach of contract claim if it did not.  Put another way, the obvious purpose of California Labor Code Section 2751's requirement of a written contract is to legally obligate employers to specify how commissions will be paid and pay them.  If an employer violates California Labor Code Section 2751 by not having such a contract, then its employees are harmed because the employer is not obligated to specify and pay commissions under such a contract.  Here, if IBM had complied with California Labor Code Section 2751, it would have had enforceable contracts with Plaintiff and the Classes; IBM would have complied with those contracts, or its employees could easily sue if IBM did not, and either way the employees would be in a better situation than they are now.

46.   Indeed, any other interpretation would render California Labor Code Section 2751 a nullity.  It would make no difference to employees whether or not their

9

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

1  employer complies with California Labor Code Section 2751: the employer can comply

2  with that statute, or it can blatantly violate the statute, but neither choice has any

3  effect on the employees.  Quite obviously that is contrary to the text and purpose of

4  California Labor Code Section 2751, which was designed to and by its plain text does

5  give employees something: an enforceable obligation from their employer.  If their

6  employer does not give them that enforceable obligation, then they are harmed.

7  California Labor Code Section 2751 is a mandate, not some gentle suggestion to

8  employers that causes no harm when it is ignored.

9  <div align="center">**PLAINTIFFS' FACTS**</div>

10  <div align="center">**Mark Comin**</div>

11  47.    Mr. Comin began his employment as an IBM sales representative in

12  approximately January 2001.

13  48.    During his time with IBM, Mr. Comin was responsible for selling various

14  IBM products and services.

15  49.    At all relevant times, Mr. Comin's compensation consisted of a base salary

16  paired with uncapped commissions, and the incentive plan he was on was the

17  Individual Quota Plan.

18  50.    Each sales period, Mr. Comin was provided with a document titled an

19  IPL, which described some of the terms of his commissions plan, as alleged above.

20  51.    However, in each sales period the IPL expressly stated that it was not an

21  express or implied contract for the payment of commissions, as alleged above.

22  52.    At no time during his employment by IBM was Mr. Comin provided any

23  other contract for the payment of his commissions.

24  53.    During his employment with IBM, three different times IBM refused to

25  pay him the full commissions he earned on deals that he closed.

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

54.     Each of these situations would have been avoided had IBM provided him with a contract that complied with Cal. Labor Code Section 2751 that set forth how his commissions would be calculated and paid.

55.     The first situation was a deal involving the sale of an IBM product named IBM Cloud Identity to AECOM in December 2016 ("AECOM Deal").

56.     The AECOM Deal consisted of revenue to IBM from Mr. Comin's products of approximately $6.4 million over the life of the deal. Of this, $925,000 should have been credited to him for purposes of calculation of his commissions. Instead, IBM paid him nothing for this deal.

57.     Despite the fact that Mr. Comin performed the work, and closed the deal related to his products, after the AECOM Deal closed IBM assigned all of the revenue attributed to the products and services that he sold to another department, and credited Mr. Comin with nothing from the sale.

58.     Mr. Comin received credit for commissions purposes for products booked under Software Group part numbers, but not for Global Technology Services part numbers. In the AECOM Deal, IBM decided that it was going to book the revenue under a Global Technology Services part number so that it would not have to pay Mr. Comin his commissions even though he performed the work necessary to close the deal.

59.     The second time that Mr. Comin was not paid his full commissions was June of 2017.

60.     This time, Mr. Comin closed a deal for the sale of a third-party product called Carbon Black  Response that IBM licensed to Intel ("Carbon Black Deal").

61.     The Carbon Black Deal was for two, one-year subscriptions, and totaled $3.375 million in commissionable revenue to Mr. Comin.

62.     In the seven previous sales of this product by other IBM sales representatives, IBM paid commissions on the full amount of the sale.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

63. After Mr. Comin closed the deal, the commissionable revenue of $3.375 million initially registered in his Attainment report.

64. However, after initially registering in his attainment report at the full value as it should have, IBM reversed the credit and only provided him with 10% of the commissionable revenue.

65. Prior to Mr. Comin's closure of this deal, there had been seven prior sales of this particular product.

66. Each of those seven prior deals resulted in the sales representative being credited with 100% of the commissionable revenue for the deal..

67. Mr. Comin was not provided any explanation why he was only credited with 10% of the commissionable revenue on this deal until after he noticed the reversal on his commission statement.

68. IBM did not credit the remaining 90% of the sale to any other sales representative. IBM routinely does not credit sales to other employees when it cuts commissions.

69. The third time that Mr. Comin was not paid the full commissions he earned was in September 2017, regarding a sale of IBM products and services to Apple ("Apple Deal"). The product Mr. Comin sold to Apple was named IBM Security Gaurdium.

70. The Apple Deal closed September 30, 2017 and should have been for approximately $1.15 million in commissionable revenue to Mr. Comin.

71. However, as the Apple Deal was closing, an IBM executive expressed a desire to include other products in the deal and close it as one larger deal known as an ELA.

72. One of the products that executive wanted to include was a product called Emptoris. However, Apple needed a component of Emptoris that IBM was going to need to develop separately, which would take approximately 18 months.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

73.     Emptoris was not a product Mr. Comin was responsible for.

74.     IBM booked the Apple Deal at the time it closed in September 2017, but its finance department refused to flow any commissions to any sales representatives who were owed commissions on the Apple Deal until either the product was delivered to IBM or the 18 month mark was reached.

75.     It has been over 18 months, and Mr. Comin has not been paid any commissions from the Apple Deal. As the Emptoris product was outside of the scope of his products, he does not know whether the Emptoris product was ever provided to Apple.

76.     Moreover, Mr. Comin was never provided a justification for why his commissions on the Apple Deal were help up since his products were not related to the Emptoris product issue.

77.     Out of frustration with IBM's refusal to pay him the sales commissions that he earned, Mr. Comin left IBM in February 2018.

### Mr. Briggs

78.     Mr. Briggs began his employment as an IBM sales representative in approximately January 1995.

79.     He became an IBM manager in 1998 and proceeded to hold various roles at the managerial level from 1998 to present.

80.     He has been an individual contributor and manager for OEM Embedded SW Sales since around April 2013.

### IBM Promised Mr. Briggs That His Commissions Were Uncapped

81.     IBM managers' compensation consists of a base salary paired with uncapped commissions based on the achievement of their sales representatives.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

82.     Said another way, everything that a seller sells rolls up to the manager's achievement.

83.     At all relevant times, Mr. Briggs's compensation consisted of a base salary paired with uncapped commissions, and the incentive plan he was on was the Individual Quota Plan.

84.     During his time at IBM, Mr. Briggs and other sales employees regularly received PowerPoint presentations describing the terms of the commission plans being offered to them. These PowerPoints consisted of over 200 pages worth of slides, and are collectively referred to as the "Educational Materials." Each year, the Educational Materials explained that sales commissions were uncapped. Nowhere in the Educational Materials is there anything stating or even suggesting that sales commissions may be capped in some instances or that IBM reserves the right to cancel or modify whether and to what extent commissions may be capped. The Educational Materials are unequivocal and state repeatedly that commissions are uncapped. These Educational materials were also available for Mr. Briggs, and other sales employees, to download during the entirety of the sales period (July-December of 2016) and afterwards.

85.     IBM made a substantially similar version of this PowerPoint available to Mr. Briggs each year for the purpose of highlighting and explaining the important terms of his compensation.

86.     The PowerPoint was titled "Our Purpose, Values & Practices" relating to "Your 2016 Incentive Plan," and it stated that the goal of the incentive plan is "to design and deliver sales incentives that motivate your performance and are

14

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

strategically aligned with IBM's strategy and transformation." Page 13 of the PowerPoint specifically stated that "[e]arnings opportunity remains uncapped."  In fact, the presentation mentions no less than six times in its 18 pages that "payments" and/or "earnings opportunit[ies]" are "uncapped."

87.     These representations were repeated in sales meetings.

88.     In fact, IBM instructs its managers to tell sales employees during the sales kickoff calls at the beginning of each sales period, and the managers actually do tell them, that commissions are uncapped.

89.     These representations are also in line with IBM's written guidance to its managers, like Mr. Briggs, which provides:

> Conditions that may lead to an adjustment include the need to correct errors or the need to balance with employee's contribution to the success of a large sales transaction (which criteria must be clearly provided to Commissions team).
>
> **Adjustments must not be done only as a ceiling or cap on the total earnings allowable to employees.**

(Emphasis added).

90.     Each sales period, Mr. Briggs was provided with a document titled an IPL, which described some of the terms of his commissions plan, as alleged above.

91.     In each sales period before 1H 2018, the IPL expressly stated that it was not an express or implied contract for the payment of commissions, as alleged above. In sales periods after 1H 2018, the IPL did not include that provision, but IBM has still claimed and argued (successfully) that those IPLs are not contracts.

92.     At no time during his employment by IBM was Mr. Briggs provided any other contract for the payment of his commissions.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

93.     As an IBM manager, Mr. Briggs's commissions were based on the achievement and commissions of the sales representatives that reported to him, including Mr. Swafford.

### Mr. Briggs's Commissions Were Capped

94.     In 2016, Mr. Swafford worked on behalf of IBM to close two large deals of IBM products and services with Oracle ("Oracle Deal") and Sabre, Inc. ("Sabre Deal"). Mr. Swafford was the sole sales representative responsible for the Oracle Deal and was one of only two sales representatives responsible for the Sabre Deal.

95.     Mr. Swafford's effort in closing the Oracle and Sabre Deals resulted in total sales of approximately $3,000,000 of IBM products and services. Mr. Swafford's achieve detail report (IBM's internal record that reflects the revenue credit attributable to Mr. Swafford) indicated that the total sales revenue attributable to him for the second half of 2016 (for all deals he closed, including the Oracle and Sabre Deals) was approximately $4,983,275. His quota at the time was $512,600.

96.     On the recognized revenue credit of $4,983,275, Mr. Swafford earned a commission of $966,316 which should have been paid to him in January 2017 after the deals were closed at the end of December 2016. He was not paid any of this commission in January 2017.[1]

97.     Mr. Swafford was then initially told that he would be paid in full, as both his first line manager (Mr. Briggs), and second line manager (Richard Wirtenson)

---

[1] Mr. Swafford noted that he was overpaid by $19,375 in the first half of 2016 due to an error by IBM. This overpayment was to be deducted from the commissions Mr. Swafford earned in the second half of 2016. Any discussions herein of the commissions due and paid/unpaid to Mr. Swafford disregard this $19,375.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

signed off on the commissions amount of $966,316 due to Mr. Swafford. Inexplicably, however, Mr. Swafford's third line manager, Don Leeke, did not approve the commissions payment.

98.    Mr. Swafford was then emailed by Mr. Briggs on February 23, 2017, who told Mr. Swafford that he had just been "informed by IBM that [Mr. Swafford's] attainment has been **capped** at 250% of plan." (emphasis added). The reason why? Mr. Briggs told Mr. Swafford in a phone call after that email that IBM decided it was simply too much money to pay Mr. Swafford the full commissions he had earned, and thus, IBM would be paying him only a portion of those commissions. In other words, IBM was capping Mr. Swafford's commissions to limit his earnings.

99.    Shortly after this, the internal IBM system indicated that Mr. Swafford would in fact be paid in full the commissions he had earned, including those on the Oracle and Sabre Deals and that he would receive his payment via direct deposit in March 2017.

100.    However, before the payment was to be deposited, Mr. Swafford received a call from an IBM employee informing him that he would be receiving a paper check, rather than direct deposit for these commissions.

101.    The commissions check he then received was in the amount of $153,384. When Mr. Swafford inquired about this discrepancy with Mr. Briggs, he was told that the commissions payments were still being reviewed by IBM.

102.    Mr. Swafford was then paid another $563,167 of the commissions from his sales in the second half of 2016, including the Oracle and Sabre Deals and was told that would be all that he would be paid for his work closing these two Deals. This left

17

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

Mr. Swafford still owed approximately $249,765 in commissions he had earned that were arbitrarily capped by IBM.

103.   The only reason Mr. Swafford was ever provided by IBM for why he was not paid all of the commissions he had earned, was that IBM thought it was simply too much money to pay Mr. Swafford, and thus, it was unwilling to pay him in full.

104.   Indeed, after further attempts to learn why he had not been paid in full, Mr. Wirtenson, his second line manager emailed him on May 1, 2017, and said: "I made the recommendation to Don that we pay on all other deals 100% but CAP the Oracle and Sabre transactions at 150% of your quota on each."

105.   This reasoning did not make any sense to Mr. Swafford as he had clearly been promised uncapped commissions, and in fact, Mr. Swafford had earned nearly a million dollars worth of uncapped commissions the previous year and been paid every dime of them.

106.   IBM did not pay any other sales representatives the $249,765, or any part of that, that it owed to and withheld from Mr. Swafford, instead keeping the money for itself.

107.   IBM's decision to cap Mr. Swafford's commissions by limiting his attainment led to Mr. Briggs's commissions being capped as well because his attainment was similarly limited.

108.   Mr. Swafford filed suit to recover his commissions, in the Northern District of California. *See Swafford v. IBM*, Case No. 5:18-CV-04916 (N.D. Cal.) (the "*Swafford* Action". IBM's motions to dismiss and for summary judgment were largely denied by the Honorable Judge Lucy Koh. Indeed, and of particular relevance here, in

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

her Order Granting in Part, Denying in Part, IBM's Motion for Summary Judgment, the Honorable Lucy H. Koh stated that "the Court agrees with Swafford that the IPL is not a contract and that the IPL therefore cannot satisfy the requirements of California Labor Code Section 2751."

109.   Mr. Swafford ultimately resolved his claims to the mutual satisfaction of the parties prior to trial.

110.   Even so, IBM still has not paid Mr. Briggs the full commissions he is owed for the same deals.

## CLASS ACTION ALLEGATIONS

111.   Plaintiffs bring this action individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) seeking injunctive and monetary relief for IBM's systematic refusal to provide its sales representatives with contracts for the payment of their sales commissions and improper withholding of sales commissions.

### A. Class Definition

112.   Plaintiffs bring this action on behalf of the following class and subclass:

Class:

All persons residing or who resided in the State of California while working for IBM on a commissions incentive plan during the Relevant Time Period.

Subclass:

All persons residing or who resided in the State of California while working for IBM on a commissions incentive plan during the Relevant Time Period and that were not paid the amount of commissions reflected in the individual's commissions formula.

113.   The Relevant Time Period is four years prior to the date the complaint was filed in this action through the present.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

114.   Plaintiffs reserve the right to amend the Class and SubClass definitions if discovery and further investigation reveal that the Classes should be expanded, divided into subclasses under Rule 23(c)(5), or modified in any other way.

115.   Plaintiffs are members of the Classes they seeks to represent.

116.   The sales commission practices described herein have been and are continuing in nature.

### B. Rule 23(a) and Rule 23(b)(3) Requirements

#### a. Numerosity

117.   The proposed Classes are so numerous that joinder of all members is impracticable.

118.   Upon information and belief, there are hundreds, perhaps thousands, of members of the proposed Classes.

119.   The Class members are ascertainable through IBM's centralized and electronically maintained records.

#### b. Commonality

120.   The prosecution of Plaintiffs' claims will require the adjudication of numerous questions of law and fact common to the class. The common questions of law and fact predominate over any questions affecting only individual Class members. The common questions include:

   a. Whether the terms of Defendant's standardized IPLs comply with California law governing earned commission wages;

   b. Whether Defendant's standardized IPLs comply with Cal. Labor Code § 2751;

   c. Whether IBM paid less to the Class members than the formulas in the IPLs provided for;

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

d.  Whether IBM should be ordered to disgorge all or part of the ill-gotten profits it received by not paying its sales representatives in accordance with their commissions formulas;

e.  Whether the Class is entitled to damages and the amount of damages;

f.  The amount of formulaic damages due to each member of the Classes;

g.  Whether IBM should be enjoined from continuing to be out of compliance with Cal. Labor Code § 2751; and

h.  In other ways as shown in discovery.

**c.  Typicality**

121.  Plaintiffs have suffered the same violations and similar injuries as other Class members arising out of and caused by IBM's common course of conduct. All Class members were subject to the same corporate practices as alleged herein, in particular, by being provided standardized commissions plans that were purportedly not a contract and ultimately being subjected to reduced commissions payments.

122.  Plaintiffs possess and assert each of the claims they assert on behalf of the proposed Classes.

123.  Plaintiffs seeks similar relief as other Class members.

**d.  Adequacy of Representation**

124.  Plaintiffs are adequate class representatives.

125.  Plaintiffs' interests are coextensive with those of the members of the proposed Classes. Plaintiffs are willing and able to represent the proposed Classes fairly and vigorously as they pursues his similar individual claims in this action.

126.  Plaintiffs will fairly and adequately protect the interests of the Classes because they have no interests antagonistic to, or in conflict with, the Classes that Plaintiffs seek to represent.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

127.    Plaintiffs have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate a class action of this size and complexity.

### e.  Predominance & Superiority

128.    A class action is superior to other available means for the fair and efficient adjudication of this controversy.

129.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly where individual class members lack the financial resources to vigorously prosecute a lawsuit against a large corporation such as IBM.

130.    Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

131.    Current IBM employees are often afraid to assert their rights out of fear of direct or indirect retaliation. Former employees are often fearful of bringing claims because doing so can harm their employment, future employment, and future efforts to secure employment. Class actions provide class members who are not named in the complaint a degree of anonymity, which allows for the vindication of their rights while eliminating or reducing these risks.

132.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Classes, establishing incompatible standards of conduct for IBM and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

133.   The issues in this class action can be decided by means of common, class-wide proof. In addition, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

134.   IBM has acted on grounds generally applicable to Plaintiffs and the proposed Classes by, among other things, adopting and following systematic policies, practices, and procedures that deprive sales employees of earned commission wages. Refusal to pay all commission wages is IBM's standard operating procedure, rather than a sporadic occurrence.

135.   IBM has acted or refused to act on grounds generally applicable to Plaintiffs and the proposed Class. IBM's systematic conduct justifies the requested injunctive and declaratory relief with respect to the Class as a whole.

### f.  Injunctive/Declaratory Relief

136.   Injunctive, declaratory, and affirmative relief are a predominate form of relief sought in this case. Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of IBM's refusal to comply with California Labor Code § 2751 and to pay all commission wages due. In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for the monetary and non-monetary remedies for individual losses caused by IBM's systemic refusal to pay full commissions.

### C.  Requirements of Rule 23(c)(4) Issue Certification

137.   Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all Class members.

### FIRST CLAIM FOR RELIEF

### (Violation of the California Unfair Competition Law)

138.   Plaintiffs re-allege and incorporate the prior paragraphs of this Complaint as if fully set forth herein.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

139.   IBM is a "person" as defined under California Business & Professions Code Section 17021.

140.   California Business and Professions Code § 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." IBM has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

141.   IBM's conduct, as described herein, was and is in violation of the UCL.

142.   IBM's conduct violates the UCL in at least the following ways:

    a.  by knowingly refusing to provide a written commissions contract to Mr. Comin, Mr. Briggs, and the Classes;

    b.  by willfully failing to pay all earned commissions wages to Mr. Comin, Mr. Briggs, and the Classes; and

    c.  by violating other California laws, including but not limited to, California Labor Code Section 2751.

143.   Furthermore, any failure to pay wages is, by definition, an unfair business practice under Section 17200.

144.   IBM's actions alleged herein caused Plaintiffs and the Classes to sell as many of IBM's products and services as they could, often at the expense of quality time with their families that they would not otherwise have sacrificed had they known that IBM would not pay them the commissions they earned.

145.   Accordingly, Plaintiffs and the Classes have suffered injury in fact including, including lost money, as a result of IBM's failure to have enforceable written contracts—which presumably IBM would have complied with, but which could be the basis for an easy breach of contract claim if it did not.  Put another way, the obvious purpose of California Labor Code Section 2751's requirement of a written contract is to legally obligate employers to specify how commissions will be paid and pay them.  If an employer violates California Labor Code Section 2751 by not having such a contract, then its employees are harmed because the employer is not obligated to specify and

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

pay commissions under such a contract.  Here, if IBM had complied with California Labor Code Section 2751, it would have had enforceable contracts with Plaintiff and the Classes; IBM would have complied with those contracts, or its employees could easily sue if IBM did not, and either way the employees would be in a better situation than they are now.

146.   IBM should be made to disgorge these ill-gotten gains and to restore to Mr. Comin, Mr. Briggs, and the Classes the wrongfully withheld wages to which they are entitled, as well as interest on these wages.

147.   As alleged above, Labor Code Section 2751 states, in pertinent part: "Whenever an employer enters into a contract of employment with an employee for services to be rendered within this state and the contemplated method of payment of the employee involves commissions, the contract shall be in writing and set forth the method by which the commissions shall be paid."  The statute also provides that an employer must give a "signed" copy of the contract to the employee and obtain a receipt for the contract from the employee.

148.   As alleged above, IBM violated section 2751 because the IPL undisputedly is not a contract, and therefore it is not sufficient under section 2751, and there is no other document that is a written contract sufficient under section 2751. Furthermore, IBM violated section 2751 because IBM did not sign any sufficient contract (and it did not sign the IPL), nor did IBM obtain a receipt from Plaintiffs or the Class for their receipt of any written contract.

149.   A violation of section 2751 serves as a predicate violation for a claim under the UCL.

150.   Plaintiffs alleges a claim against IBM for violation of the UCL for its unlawful conduct in violating the provision of section 2751, as outlined above.

151.   Plaintiff Briggs seeks to enjoin further unlawful, unfair, and/or fraudulent acts or practices by Defendant under Cal. Bus. & Prof. Code § 17200 *et seq.*

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

152.   Plaintiffs requests that this Court enter such orders or judgments as may be necessary to enjoin IBM from continuing its unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class Members any money it acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth below, including, but not limited to Plaintiffs' attorneys' fees.

## SECOND CLAIM FOR RELIEF
### (Unjust Enrichment)

153.   Plaintiffs re-allege and incorporate the prior paragraphs of this Complaint as if fully set forth herein.

154.   At the specific request of IBM and for its use and benefit, Plaintiffs and the Subclass performed work for IBM in the form of making sales of its software and services.

155.   IBM received substantial benefits from the sales obtained by Plaintiffs and other members of the Subclass, including benefits from the receipt and unjust retention of sales commissions notwithstanding IBM's representations and obligations not to do so.

156.   The full value of the work performed for IBM by Plaintiffs and the Subclass for which they have not been paid is tens of millions of dollars, although the exact amount is for the jury.

157.   During and since the performance of the work by Plaintiffs and the Subclass, IBM has failed to pay them and there is due and owing to Plaintiffs and the Subclass from IBM a principal sum amount of tens of millions of dollars.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

158.   It is unjust to allow IBM to retain the benefits received because of IBM's wrongful conduct and at the expense of Plaintiffs and other members of the Subclass.

159.   IBM's retention of those benefits came at the expense of Plaintiffs and other members of the Subclass.

160.   IBM's continued retention of some or all of the monies it gained through its wrongful acts and practices described herein was and is unjust considering the circumstances of IBM obtaining those monies.

161.   Plaintiffs and the other members of the Subclass are entitled to a judgment against IBM ordering the restitution and/or disgorgement of all monies, benefits, and other compensation obtained and retained by the IBM by which it has been unjustly enriched because of its wrongful conduct, in an amount of *at least* $75,000 with the exact amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### (In the Alternative, Breach of Contract)

162.   Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

163.   Plaintiff's primary claim is for violation of the UCL through violation of California Labor Code § 2751, because the IPL does not satisfy California Labor Code § 2751.  However, to the extent that IBM claims and/or ultimately proves that the IPL does satisfy California Labor Code § 2751, then Plaintiff and the Classes would have a claim for breach of the IPL.  Plaintiff makes this claim only in the alternative to the First Claim for Relief, in the event that IBM claims and/or ultimately proves that the IPL is an enforceable contract for the payment of commissions that would satisfy California Labor Code § 2751.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

164.   If the IPL satisfies California Labor Code § 2751, then it is an enforceable contract.  It is supported by consideration and is valid in all respects.

165.   If the IPL satisfies California Labor Code § 2751, such that the IPL is an enforceable contract, then IBM has breached the Plaintiff's IPL and the similar IPLs of the Class by failing to fulfill its obligations under the IPL, including the obligation to specify the method by which commissions are paid and pay them.

166.   Plaintiff and the Class have been damaged by the breach of contract, by the difference between amount that the IPL's commissions formulas would produce and the amount that they were actually paid.

## <u>FOURTH CLAIM FOR RELIEF</u>
### (Violation of Private Attorneys General Act of 2004, Labor Code §§ 2698, *et seq.*)

167.   Plaintiff Briggs re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

168.   The policies, acts, and practices described in this Second Amended Complaint were and are unlawful acts in violation of applicable Labor Code sections. The unlawful policies, acts, and practices include, but are not limited to:

a.   Failure to provide a timely, written, signed commission contract as required by Section 2751; and

b.   Failure to provide a commission contract setting forth the method by which commission wages are calculated and paid as required by Section 2751.

169.   The lack of required commissions contracts, as well as IBM's policies, acts, and practices described in this Second Amended Complaint violate applicable Labor Code sections. These violations are ongoing and continuing.

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

170. Plaintiff Briggs, as an aggrieved employee, seeks recovery of civil penalties as prescribed by PAGA on behalf of himself and other current and former similarly aggrieved employees of IBM against whom one or more of the violations of the Labor Code was committed.

171. In accordance with Labor Code § 2699.3, Plaintiff Briggs gave written notice on August 27, 2021, to the California Labor and Workforce Development Agency and IBM of the Labor Code violations alleged herein. ***See* Exhibit A (PAGA Notice letter).** Plaintiff Briggs did not receive written notification from the LWDA of the State's intention to investigate the allegations set forth in Plaintiff's August 27, 2021, notice, nor notice of cure from IBM. Plaintiff Briggs properly filed this claim more than sixty days later.

172. Plaintiff Briggs has also incurred and continues to incur attorneys' fees and costs to prosecute the Labor Code violations pursuant to PAGA

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Comin, Mr. Briggs, and the Classes pray the Court for the following relief:

1. That the Court certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. That the Court name Plaintiffs as Class Representative and their counsel as Class Counsel;

3. That the Court grant restitution to Plaintiffs and the Classes and require IBM to disgorge ill-gotten gains and monies by which it was unjustly enriched;

4. That Mr. Comin, Mr. Briggs, and the Classes have and recover from IBM for violations of the California Unfair Competition Law injunctive relief authorized by Business and Professions Code Section 17200 *et. seq.*;

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

5.     That the Court grant restitution to Plaintiffs and the Classes and require IBM to disgorge ill-gotten gains and monies by which it was unjustly enriched;

6.     In the alternative, that Mr. Comin, Mr. Briggs, and the Classes have and recover from IBM damages for breach of contract;

7.     That the Court award attorneys' fees to Plaintiffs pursuant Cal. Civ. Proc. Code § 1021.5, California Labor Code § 2699(g), and any other applicable law;

8.     Mr. Briggs and the Classes have and recover for penalties and unpaid wages as provided by the Private Attorneys General Act of 2004;

9.     That the Court award Plaintiffs and the Classes pre-judgment and post-judgment interest at the highest legal rate provided by law;

10.    That all costs of this action be taxed against IBM; and

11.    That the Court award Mr. Comin, Mr. Briggs, and the Classes such other and further relief as this Court may deem just and proper.

12.    PLAINTIFFS DEMAND A TRIAL BY JURY.

This the 16th day of December 2021.

<div style="margin-left:40%">

BY:   */s/ Alex R. Straus*
Alex R. Straus (SBN: 321366)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
280 Beverly Hills Drive
Beverly Hills, CA 90212
Telephone:   917-471-1894
Facsimile:   310-496-3176
astraus@milberg.com

Matthew E. Lee*
Mark R. Sigmon*
Jeremy R. Williams*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035

</div>

30

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded

mlee@milberg.com
msigmon@milberg.com
jwilliams@milberg.com

Kent A. Bronson*
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
100 Garden City Plaza
Garden City, NY  11530
Telephone:  (212) 594-5300
Facsimile: (212) 868-1229
kbronson@milberg.com

*Counsel for Plaintiff*

*\*Admitted pro hac vice*

CONSOLIDATED CLASS ACTION COMPLAINT
Jury Trial Demanded